UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------

SHATOYA WILLIAMS,

                                                    Plaintiff,

                          -v-

FIREQUENCH, INC. *d/b/a* FIRETRONICS,

                                                 Defendant.

------

21 Civ. 4112 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

On May 7, 2021, plaintiff Shatoya Williams filed a Complaint, which alleged employment discrimination by defendant Firequench, Inc. *d/b/a* Firetronics ("Firequench"). Dkt. 1 ("Compl."). On May 19, 2021, Williams served Firequench with process pursuant to New York Business Corporation Law § 306, which, for a corporate entity, permits service upon a clerk in the office of the New York Secretary of State, Dkt. 5. That made Firequench's deadline to answer or otherwise respond June 9, 2021. *Id.* Firequench, however, did not respond to the complaint or otherwise appear in this action. Accordingly, the Clerk of Court issued a certificate of default as to Firequench, Dkt. 9, and Williams moved for a default judgment, Dkt. 10; *see* Dkt. 13 (re-filed). The Court then entered a default judgment as to liability against Firequench, Dkt. 16, and referred the case to the Honorable James L. Cott, United States Magistrate Judge, for an inquest into damages, Dkt. 17.

On August 29, 2022, Judge Cott issued a Report and Recommendation that the Court award Williams damages in the amount of $142,421.45 ($90,930.79 in back pay, $30,000 in emotional distress damages, $20,900 in attorneys' fees, and $590.66 in costs), in addition to pre-judgment interest on the backpay award and post-judgment interest on all sums awarded. Dkt.

24 (the "Report"). The parties had 14 days to then file written objections. *See id.* at 28. Shortly before that period ended, on September 1, 2022, Firequench, for the first time, appeared, *see* Dkts. 25–26. The Court then permitted Firequench to move to vacate the default judgment and adjourned the parties' deadline to object to the Report *sine die* pending resolution of the motion to vacate. Dkt. 29.

On September 9, 2022, Firequench moved to vacate. Dkts. 30–32, 33 ("Def. Mem."). In an order issued September 29, 2022, the Court stated that it would condition any vacatur of the default judgment on Firequench's payment of the fees and costs that Williams had reasonably incurred in connection with pursuing the default judgment and inquest. Dkt. 36. On October 11, 2022, counsel for Williams filed an accounting of those fees and costs, which together exceeded $17,000. Dkt. 37. On October 18, 2022, counsel for Firequench objected that no more than $7,500 of these fees and expenses should be treated as reasonable but, subject to that objection, stated that Firequench would "pay fees and costs plaintiff reasonably incurred in connection with pursuing the default." Dkt. 38 ¶ 4.

The Court now considers whether to vacate the default judgment against Firequench, a "question . . . committed to the discretion of the Court." *Star Asia Int'l, Inc. v. Old Dominion Footwear, Inc.*, No. 18 Civ. 4741 (JMF), 2019 WL 2371632, at *1 (S.D.N.Y. June 5, 2019) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

Firequench moved to vacate pursuant to both Federal Rule of Civil Procedure Rule 55(c) and Rule 60(b). *See* Dkts. 30–33. Rule 60(b), however, governs "final judgments," and "a judgment is 'final,' . . . only 'when there is nothing left for the Court to adjudicate.'" *Murray Eng'g, P.C. v. Windermere Props. LLC*, No. 12 Civ. 0052 (JPO), 2013 WL 1809637, at *3 (S.D.N.Y. Apr. 30, 2013) (citation omitted). "Therefore, it is the 'good cause' standard of Rule

55(c), as opposed to the more rigorous standards of Rule 60(b), that applies to a circumstance such as this, where an inquest on damages has been ordered" but has not been adopted as final by the Court. *Id.* (internal quotation marks and citation omitted); *see also Roberts v. Keith*, No. 04 Civ. 10079 (CSH), 2007 WL 2712853, at *2 (S.D.N.Y. Sept. 18, 2007).

When assessing what constitutes "good cause" under Rule 55(c), courts consider the following factors: "(1) whether the default was willful; (2) whether the defendant demonstrates the existence of a meritorious defense, and (3) whether, and to what extent, vacating the default will cause the nondefaulting party prejudice." *Robinson v. Sanctuary Music*, 383 F. App'x 54, 58 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Green*, 420 F.3d at 108); *see also Peterson v. Syracuse Police Dep't*, 467 F. App'x 31, 33 (2d Cir. 2012). "A finding that one factor militates against good cause is not dispositive." *Murray Eng'g, P.C.*, 2013 WL 1809637, at *4.

The first factor, willfulness, "may be found where there is 'evidence of bad faith,' or the default arose 'from egregious or deliberate conduct.'" *Holland v. James*, No. 05 Civ. 5346 (KMW), 2008 WL 3884354, at *2 (S.D.N.Y. Aug. 21, 2008) (quoting *Am. All. Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996)). Such a finding "requires 'more than mere negligence,' more than 'mere administrative or clerical error,' and more than 'careless or negligent errors.'" *Id.* (quoting *Am. All. Ins. Co.*, 92 F.3d at 60–61). Of the three factors bearing on the existence of good cause, "willfulness carries the most weight." *De Curtis v. Ferrandina*, 529 F. App'x 85, 86 (2d Cir. 2013); *see Gil v. Frantzis*, No. 17 Civ. 1520 (ARR), 2019 WL 4784674, at *5 (E.D.N.Y. Oct. 1, 2019) (same).

As to that factor, analysis begins with the fact, which the Court finds, that Williams properly served the summons and complaint in conformity with the Federal Rules of Civil

Procedure.  On May 19, 2021, a process server for Williams delivered the summons and complaint to the Secretary of State.  Dkt. 5.  In New York, service can be effected on a corporation by serving the secretary of state by personally

> delivering to and leaving with the secretary of state or a deputy, or with any person authorized by the secretary of state to receive such service, at the office of the department of state in the city of Albany, duplicate copies of such process together with the statutory fee, which fee shall be a taxable disbursement.  Service of process on such corporation shall be complete when the secretary of state is so served.

*Hoffman v. Ighodaro*, Nos. 16 Civ. 0155, 16 Civ. 4380 (LAK) (JCF), 2016 U.S. Dist. LEXIS 136326, at *21–22 (S.D.N.Y. Sept. 28, 2016) (emphasis added); *see* N.Y. Bus. Corp. Law § 306(b)(1).  Throughout the default action, Williams continued to serve Firequench (as ordered by the Court at various junctures) via the Secretary of State.  *See* Dkts. 12, 19, 23.

Despite Williams's repeated acts of proper service, Firequench claims to have not received any notice of this action before receiving the Report.  It states: "Because Firequench had relocated its business office and the address on file for Firequench with the Secretary of State was outdated, Firequench never received any of Plaintiff's filings presumptively mailed by the Secretary of State's office."  Def. Mem. at 5.  It adds: "Firequench only became aware of this action on August 31, 2022[,] when it received a copy of the Report and Recommendation."  *Id*.  Firequench in fact faults Williams for serving it via the Secretary of State, stating that Williams had an obligation to perform service on Firequench on its correct, "readily ascertainable" address because (1) "[t]he first page of 'Google' search results for the search 'Firequench address' lists Firequench's current address"; and (2) "[t]he correct, current address was also known to Plaintiff and her attorneys, who were issued a 'Notice of Right to Sue' from the [Equal Employment Opportunity Commission] on April 6, 2021, addressed to Firequench at its current address."  *Id.* at 8.

4

To the extent Firequench seeks to shift responsibility to Williams for its failure to appear by arguing that Williams was obliged to determine a "correct" address different than the one Firequench had placed on file with the Secretary of State, and thereafter to serve Firequench at that address, Firequench misstates the law. It was Firequench's obligation—and solely its obligation—to maintain a correct address with the Secretary of State. *See* N.Y. Bus. Corp. Law § 304(d). After serving a corporate defendant via the Secretary of State, "a plaintiff has no further obligation to contact defendants in order to complete service. Moreover, failure to actually receive the summons and complaint from the Secretary of State does not make service improper." *Logan v. World Luxury Cars, Inc.*, No. 15 Civ. 00248 (ENV) (PK), 2022 WL 2466834, at *4 (E.D.N.Y. Mar. 30, 2022) (quoting *Miller v. Collectron Corp.*, No. 98 Civ. 2221 (JG), 1999 WL 730981, at *7 (E.D.N.Y. Sept. 16, 1999)).

Firequench's failure to appear, however, does not itself establish its willfulness. And where the failure to appear derives from negligence alone—for example, a corporate defendant's failure to update its address with the state—courts generally have not treated such a lapse as a willful evasion of service sufficient to establish a willful default. *See, e.g.*, *King v. Mastronardi Mason Materials, Inc.*, No. 98 Civ. 7389 (EHN), 1999 WL 294738, at *2 (E.D.N.Y. Mar. 22, 1999). Rather, there must be some evidence of "egregious" conduct that is "not satisfactorily explained." *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998).

However, the record developed before the Court supplies that evidence, insofar as it demonstrates, as the Court finds, that Firequench made a false representation to the Court as to how it obtained notice of this action. The pertinent events are as follows.

On September 29, 2022, the Court directed Firequench—given its appearance just days before objections to the Report were due—to file a sworn declaration explaining how it had

5

"ultimately became aware of this litigation and the default judgment against it." Dkt. 36. On October 18, 2022, Firequench's owner, Desmond Burke, responded, stating the following in a sworn declaration:

> Firequench did not receive any of the papers that were filed in this action, save the Report and Recommendation by Magistrate Cott, which was sent to our office via US Mail. Up until that point of time, my company never received any court filings from either the Plaintiff or from the Secretary of State. As indicated above, Firequench first became aware of this action on August 31, 2022, when it received the Report and Recommendation in the Mail from Division of Labor Standards, State Office Building Campus, Room 266A-IPCS, Albany New York 12240. A copy of the Letter we received [containing] the Report and Recommendation is attached as Exhibit 1.

Burke's declaration attached a color scan of what Burke represented was the outside of the large mailing envelope in which, he claimed, the Report had been sent to Firequench. The envelope, as scanned, appeared to contain (1) a stamped return address for the Office of Labor Standards, in the upper left-hand corner, and (2) a mailing label containing Firequench's typed



mailing address on West 37th Street in Manhattan, in the center of the envelope. *See* Dkt. 38-1. Although Burke's declaration did not reveal this point, Firequench, as later became apparent, had reproduced only a portion of the envelope. Burke also did not attach a scanned copy of the purported contents of the envelope (*i.e.*, the Report).[1]

This filing prompted Williams's counsel, on October 24, 2022, to file a letter noting "two troubling issues" with Burke's affidavit. Dkt. 39. As the Court synopsized in an order issued the following day, October 25, 2022, the issues were that "(1) an explanation is lacking as to why the Division of Labor Standards would have been involved in this case such that it mailed the Report and Recommendation to the defendant;" and "(2) the scanned copy of the envelope is 'cut off on the side' such that 'it is unclear when the envelope was mailed.'" Dkt. 40 (quoting Dkt. 39). In light of these shortcomings, the Court's order stated, the Court could not, on the record as it stood, credit Firequench's account that it had purportedly became aware of the lawsuit by virtue of a mailing from the Division of Labor Standards. But, the order stated, the Court would "give Firequench a final opportunity to supply credible proof that it learned of this action via an August 2022 mailing from the Division of Labor Standards." *Id.* Specifically, the Court directed Firequench to submit a letter that (1) "certifies that the scanned image at Docket 38-1 accurately depicts the envelope received by Firequench on August 31, 2022; (2) attaches scanned copies of all items contained in that mailing and the envelope *in full*; and (3) attaches as an exhibit a sworn declaration from a competent official within the Division of Labor Standards attesting that the agency sent the envelope at Docket 38-1 and its contents to Firequench around August 31, 2022, and explaining why the agency did so." *Id.* (emphasis added).

---

[1] Burke's affidavit did not address the state of the envelope. It stated, confusingly: "A copy of the Letter we received the Report and Recommendation is attached as Exhibit 1." Dkt. 38-1 ¶ 7.

7

On November 7, 2022, Firequench responded to the Court's order. It supplied a sworn declaration from Burke certifying that "the scanned image at Docket 38-1 accurately depicts the envelope received by Firequench on August 31, 2022." Dkt. 41-4. It also submitted additional scanned images of the envelope and its contents, *see id*. As explained below, the newly supplied images, now depicted, in black and white, the entire face of the envelope, rather than a portion. In response to the Court's third request, however, Firequench did not supply any proof that it had learned of this action from the Division of Labor Standards. It provided only a statement from its counsel that attempts (by email and phone) to reach the agency had proven unsuccessful, *see* Dkts. 41-1, 41-2, 41-3.

The Court, after reviewing Burke's declaration and the attached scanned images, and viewing his explanation in light of the assembled record, cannot credit Firequench's improbable account of how and when it purportedly became aware of the lawsuit.

Burke's declaration sharpens the version of events Firequench asks the Court to credit. He states that on August 31, 2022, Firequench received the envelope, bearing the return address of the Division of Labor Standards, in the mail. Dkt. 41-4 ¶ 3. The mailing contained only the Report; there were "no cover letter and no notes in the envelope," *id.* ¶ 4. The mailing thus did not explain how the Division of Labor Standards accessed the Report; or for what purpose the agency had taken upon itself to send it, without comment, to Firequench. Receipt of the Report from the Division of Labor Standards, Burke states, was the first time either Burke or anyone at Firequench had notice of this action. *Id.* As soon as Burke "became aware of this document, [he] reached out to [his] attorney to enter an appearance in the action and seek to have the default

vacated."[2]  *Id.* ¶ 5.  Other than receiving the envelope containing Judge Cott's Report, Burke attests, he "has had no communication with the Division of Labor and received no follow up communication from them after receipt of this Envelope."  *Id.* ¶ 6.  As a result, Burke attests, he "is unaware of Division of Labor's reasoning for sending [him] this."  *Id.* ¶ 7.

Critically, in assessing Burke's account, the scan of the envelope that he provided on November 7, 2022, in response to the Court's order, captures the full face of the alleged mailing envelope, whereas the earlier scan had left the upper left area (*i.e.*, where the full return address would normally be written) cut off and the upper right area (*i.e.*, where a stamp would normally be affixed) absent.  The envelope in full as scanned at Docket 41-4 appears as follows:

---

[2] Defense counsel indeed entered an appearance on September 1, 2022, the day after Firequench claims to have become aware of this lawsuit.  *See* Dkt. 25.



Two areas are newly visible. First, in the upper-left corner, above the stamped address, there is an additional printed return address for the Division of Labor, which, albeit partly covered by a barcode sticker, appears to recite substantially the same return address. Second, in the upper-right corner, a stamp is now apparent; the entirety of this corner had been cut off in the image initially attached to Burke's first declaration. The stamp reads, *inter alia*, "US POSTAGE," "$001.44," and displays a barcode.

      The Court here reproduces an enlarged view of the stamp newly visible on the image supplied by Firequench in response to the Court's order:



With the benefit of enlargement, the stamp can be read to contain—moving clockwise from the top right—the words "FIRST CLASS MAIL"; below it, in large letters the figure "$001.44"; below it, the letters "ZIP" and the apparent zip code "12240"; and below it, a number string "041L12224192." To the left is a barcode; above it, a block with white letters reading "US POSTAGE"; and above it, and below the letters "neopost," a date: "07/21/22."

The date stamp is important. In neither set of submissions did Firequench or Burke note or attempt to explain the envelope's date stamp. That date raises grave doubts of the veracity of Burke's account that Firequench received the envelope on August 31, 2022. Burke has attested that the envelope contained only one item: Magistrate Judge Cott's Report. *See id.* ¶ 4. But the

11

Report was published on August 19, 2022.  *See* Report at 29 ("Dated: August 19, 2022").  It was publicly docketed that same day.  *See id.*  The envelope in which the Report was purportedly mailed to Firequench's correct address, therefore, displays a date stamp that *predates* the publication of the Report by nearly a month.

The envelope, as initially presented in incomplete form to the Court, did nothing to support Firequench's improbable claim that the Division of Labor Standards, a non-party and a non-juridical entity, had taken it upon itself, without explanation, to send a Magistrate Judge's inquest Report to Firequench.  The envelope presented merely as a transmittal envelope, albeit with the oddities noted by plaintiff's counsel.

The date stamp now revealed to have been on the full envelope, predating as it does the Report, supports a more troubling conclusion.  It supports that the envelope had been received by Firequench earlier, on or soon after the stamped date, for some reason having nothing to do with Judge Cott's as-of-then-unissued Report; and that the envelope was later scanned by Firequench for submission to the Court, with the date excised so as to assure that the envelope did not undermine Firequench's account that it had been sent the Report from the Division of Labor Standards.  That series of events puts the lie to Firequench's claim to have learned of this litigation via the Division of Labor Standards.[3]

Firequench's presentation to the Court of an image of an envelope with the side and top cut off so as to excise the telltale date stamp is disquieting.  Insofar as the July 21 date had the

---

[3] Corroborating that conclusion is the curious appearance of two largely duplicative return addresses for the Division on the left-hand side of the envelope.  The top address was excised on Firequench's first submission to the Court.  It was on the same vertical plane as the date stamp that was also excised.  The possibility presents itself that the lower address was added, by Firequench, as a means to support that the Report came from the Division of Labor Standards, after it became apparent that excising the date stamp would mean excising the original return address.

12

obvious capacity to explode Firequench's claim to have received the August 19 report in late August, Firequench's excision of this part of the envelope is strong evidence of the mendacity of its account.

In any event, even if no date had been presented on the envelope, Firequench has not explained why a state agency that played no role in and had no connection to this federal lawsuit took it upon itself to mail Judge Cott's Report of his damages inquest to a defendant who had not appeared in the case. Nor has it explained why the agency's mailing was unaccompanied by any explanation of its purpose. Nor has it explained why the Division of Labor Standards knew to mail the Report to Firequench's *correct address*, given that the company's address on file with the state for the purposes of service of legal documents was different, and incorrect. Firequench has also not come forward with any substantiation for its implicit claim that its mail had ceased to be forwarded from its old business address to its new one.

The assembled circumstances instead regrettably but unavoidably give rise to the sorry inference that Firequench learned of the lawsuit through other means that it chose not to disclose to the Court. Perhaps Firequench had followed the lawsuit all along and elected to surface only when the damages inquest made the Court's entry of a default judgment as to damages imminent. Perhaps at some intermediate point, Firequench had been forwarded mail from its old address, including filings in the lawsuit. *But see* Def. Mem. at 8 (Firequench denying this). Perhaps it had learned of the lawsuit by some other means. In all events, the Court rejects, as far more likely false and fabricated than not, Firequench's claim to have received notice of the lawsuit via a mailing in late August 2022 from the Division of Labor Standards that contained Judge Cott's Report as to damages and nothing further.

On the bases of what it finds to be a concocted narrative submitted with the goal of avoiding a costly default judgment, the Court finds "egregious" bad faith and "not satisfactorily explained" conduct by Firequench, *S.E.C.*, 137 F.3d at 738. The Court specifically infers that Firequench tactically elected not to surface in this matter until the 11th hour. The Court thus finds a willful default. *See, e.g.*, *Schwarz v. Thinkstrategy Cap. Mgmt. LLC*, No. 09 Civ. 9346 (PAE), 2016 WL 29626, at *4 (S.D.N.Y. Jan. 4, 2016) (willful default found where defendant has demonstrated "deceitful" behavior to avoid judicial proceeding); *Belizaire v. RAV Investigative & Sec. Servs., Ltd.*, 310 F.R.D. 100, 104 (S.D.N.Y. 2015) (willful default found where defendant offers "no explanation" for failure to participate in litigation).

Where a finding of willfulness is made, "[t]he Court need not even examine the other factors in the analysis of whether to vacate entry of the default judgment," *Star Asia Int'l, Inc.*, 2019 WL 2371632, at *3, because "in general, courts should not set aside a default that is found to be willful," *id.* at *1 (concluding that default was willful and therefore declining to examine other factors in the analysis); *see, e.g.*, *Brien v. Kullman Indus., Inc.*, 71 F.3d 1073, 1078 (2d Cir. 1995) ("[C]ourts should not set aside a default when it is found to be willful.") (citation omitted); *Gesualdi v. Reid*, No. 14 Civ. 4212 (ADS), 2017 WL 752157, at *10 (E.D.N.Y. Feb. 27, 2017) (denying motion to vacate a default judgment based on a finding that the default was willful, without consideration of the meritorious defense and prejudice factors); *see also SEC v. Breed*, No. 01 Civ. 7798 (CSH), 2004 WL 1824358, at *12 (S.D.N.Y. Aug. 13, 2004). Firequench's willful default, and its submission of what the Court has found to be a false narrative of its non-willfulness corroborated by submission of a doctored envelope, alone support denying its motion to vacate the default.

In the interest of completeness, however, the Court briefly addresses the second and third factors.

The second factor is "whether the defendant demonstrates the existence of a meritorious defense," *Robinson*, 383 F. App'x at 58 (internal quotation marks omitted) (quoting *Green*, 420 F.3d at 108). Williams's claim in this lawsuit is that, on the basis of her gender, Firequench refused to consider her for a role as a fire alarm technician, *see* Dkt. 1 ¶¶ 14–25, in violation of Title VII, New York state law, and New York City law. *See* 42 U.S.C. §§ 2000e *et seq.*; N.Y. Exec. Law §§ 296 *et seq.*; N.Y.C. Admin. Code §§ 8-502(a) *et seq.* The federal and state claims are generally treated as "analytically identical," and addressed together. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (citation omitted); *see also EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 832 (S.D.N.Y. 2013) (citing *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010)). Both are governed by the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016).[4]

---

[4] Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a *prima facie* case of employment discrimination by showing that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (alterations omitted) (quoting *Walsh*, 828 F.3d at 75). If the plaintiff meets that "minimal" burden, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993), "a temporary 'presumption' of discriminatory motivation" arises, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)). The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct. *Littlejohn*, 795 F.3d at 307. Upon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination. *See id.* at 307–08. At the motion to dismiss stage, a plaintiff's burden is lower. *Forkin v. Loc. 804 Union (IBT)*, 394 F. Supp. 3d 287, 307 (E.D.N.Y. 2019).

Although the Court—given the absence of discovery—cannot gauge whether Williams's claims would have prevailed on a full record, the issue on a motion to vacate default judgment is different. It is whether Firequench has demonstrated that, were the case to proceed to the merits, it would have a meritorious defense. It has not done so. "[T]o make a sufficient showing of a meritorious defense in connection with a motion to vacate a default judgment, the defendant need not establish his defense conclusively, but he must present evidence of facts that, if proven at trial, would constitute a complete defense." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 167 (2d Cir. 2004) (quoting *S.E.C.*, 137 F.3d at 740) (internal quotation marks omitted). The defense that Firequench has proffered in seeking to vacate the default is that Williams was not qualified for the job because she lacked the "two years of 'alarm technician' experience that Firequench indicated as necessary in its job posting." Def. Mem. at 12–13 (quoting Dkt. 22-4 (job posting)). But the job posting, whose authenticity Firequench acknowledges, does not make that experience "necessary." In relevant part, the job posting reads: "Alarm Technician: 2 years (preferred)," Dkt 22-4. Something that is "preferred," *id.*, is, by its plain textual meaning, not "necessary," Def. Mem. at 12–13. That Williams lacked that experience would not have barred her from consideration for the job, particularly where her resume listed previous technical training with fire alarm systems, *see* Dkt. 32-2 (resume).[5]

Thus, the second factor, whether the defendant has demonstrated the existence of a meritorious defense, does not favor vacating the default.

---

[5] Firequench also states that it hired a candidate with "superior qualifications." Def. Mem. at 13. But Firequench's false representation that it excluded Williams from consideration because she lacked a "necessary" job requirement raises, given her claim of gender discrimination, obvious questions about pretext. In any event, "a defendant must present more than conclusory denials when attempting to show the existence of a meritorious defense." *Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 173 (2d Cir. 2001) (citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 98 (2d Cir. 1993)).

The final factor—prejudice to the plaintiff—appears also to disfavor vacatur. "[I]t is well established that 'delay alone is not a sufficient basis for establishing prejudice. Rather, it must be shown that delay will result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud or collusion.'" *Murray Eng'g*, 2013 WL 1809637, at *5 (quoting *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983)). But "[t]his case is not a case where '[d]elay stand[s] alone.'" *World Magic Int'l AVV v. Eddy Int'l Ltd.*, No. 09 Civ. 1447 (DC), 2010 WL 4457184, at *2 (S.D.N.Y. Nov. 1, 2010) (quoting *Enron*, 10 F.3d at 98). Here, Williams contends that "vacating the default judgment will unduly prejudice Plaintiff because it will cause additional fading of witness memories and loss of evidence." Dkt. 35 at 8–9. The nature of Williams's claims, of gender discrimination in hiring, makes it reasonably likely that accounts from eyewitnesses, including participants in the hiring process and persons with whom they spoke, will prove salient to a finder of fact. This case is thus different from some species of commercial cases, for example, actions to recovery on a promissory note, where the decisive evidence is less likely to disappear or fade over time. *See, e.g.*, *Kuklachev v. Gelfman*, No. 08 Civ. 2214 (CPS) (VVP), 2009 WL 497576, at *3 (E.D.N.Y. Feb. 26, 2009) (no prejudice found where dispute was contractual in nature and non-defaulting party could not allege loss of evidence or increased difficulties of discovery).

Williams brought this lawsuit more than 18 months ago. The events at issue, as alleged, began on or around May 15, 2019, when Williams applied for a job with Firequench via an online portal. Compl. ¶ 14. A few days later, she claims, an unidentified woman called her, stated that Firequench had received her job application, and proceeded to ask her gender. *Id.* ¶ 15. After Williams identified herself as a woman, the caller informed her that the company does not hire "females for this position," *id.*, because "[t]he job requires you to work in

17

skyscrapers and tall buildings and our insurance company won't allow us to hire females for that position," id.  "Shortly thereafter," Williams states, she called back the number that called her "to get more information," id. ¶ 16, and to verify "that she could not be hired for the Fire Alarm Technician position because she was a woman," id.  The woman who answered Williams's call allegedly responded, "You must have spoken with Karen or Mary. They're both busy right now. I will document everything in your file," id.  The Complaint does not indicate that these conversations were recorded, and there is no reason to assume they were, on either end.  One later conversation, however, appears to have been recorded, see Dkt. 13 at Ex. E[6]—a call made on or about May 20, 2019, by Williams to Firequench's offices again, to say, "I just want to confirm that even if I am qualified for the position that I applied for, because I am a female, I can't [get the job]," to which the unidentified woman replied, "We can't really converse . . . but the answer to your question is Yes.  That is what you were told."  Compl. ¶ 17.

More than two years have passed since these events.  Central to Williams's claims will be (1) identifying her unidentified phone interlocutors, and (2) deposing these individuals about their statements and actions.  As a result of Firequench's nonappearance, however, discovery has not begun.  Thus, the memories of witnesses of these salient events have, by now, had more than two years to fade or lose reliability.  Williams's concern about fading memories is therefore a plausible one.  See World Magic Int'l AVV, 2010 WL 4457184, at *2 ("Twenty months have passed since plaintiff filed its complaint, and it has not yet had an opportunity to conduct any discovery.  Vacating the default judgment would result in more delay and, consequently,

---

[6] Counsel for Williams, in an affidavit to the Court during the default proceedings, seemingly attempted to provide the Court with a copy of the audio recording as an exhibit to his declaration. However, ECF generally does not permit the upload of audio recordings, and the docket entry for the exhibit does not contain an audio recording, but instead, a blank page that states "EXHIBIT E (May 20, 2019 recordings)." Dkt. 13 at Ex. E.

18

additional fading of witness memories and loss of evidence."); *see also Manzanares v. Your Favorite Auto Repair & Diagnostic Ctr., Inc.*, No. 17 Civ. 5001 (MKB) (RML), 2020 WL 6390162, at *8 (E.D.N.Y. Nov. 2, 2020) (prejudice factor weighs in favor of non-defaulting party based on conclusion that defaulting party's deceitful conduct increases likelihood of destruction of evidence); *Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf*, 241 F.R.D. 451, 455 (S.D.N.Y. 2007) (same).

All three factors, therefore, disfavor vacating the default.

Firequench's motion to vacate the default judgment is thus denied. The Clerk of Court is respectfully directed to terminate the motion at Docket 30. The Court will now reopen the period for objections from either party to the Report until one week from the date of this decision.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: December 5, 2022
   New York, New York