UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHATOYA WILLIAMS,

                                        Plaintiff,

                    -v-

FIREQUENCH, INC. *d/b/a* FIRETRONICS,

                                        Defendant.

---

21 Civ. 4112 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision arises from a damages inquest conducted after the Court entered a default judgment as to liability against defendant Firequench, Inc. ("Firequench").

On May 7, 2021, plaintiff Shatoya Williams filed a Complaint, which alleged employment discrimination by Firequench, Inc. *d/b/a* Firetronics. Dkt. 1 ("Compl."). On May 19, 2021, Williams served Firequench with process pursuant to New York Business Corporation Law § 306, which, for a corporate entity, permits service upon a clerk in the office of the New York Secretary of State. Dkt. 5. That made Firequench's deadline to answer or otherwise respond June 9, 2021. *Id.* Firequench did not respond to the Complaint or otherwise appear in this action. Accordingly, the Clerk of Court issued a certificate of default as to Firequench, Dkt. 9, and Williams moved for a default judgment, Dkt. 10; *see* Dkt. 13 (re-filed). The Court then entered default judgment as to liability against Firequench, Dkt. 16, and referred the case to the Honorable James L. Cott, United States Magistrate Judge, for an inquest into damages, Dkt. 17.

On August 29, 2022, Judge Cott issued a Report and Recommendation (the "Report") that the Court award Williams damages in the amount of $142,421.45 ($90,930.79 in backpay, $30,000 in emotional distress damages, $20,900 in attorneys' fees, and $590.66 in costs), in

addition to pre-judgment interest on the backpay award and post-judgment interest on all sums awarded. Dkt. 24. The parties had 14 days to then file written objections. *See id.* at 28. Shortly before that period ended, on September 1, 2022, Firequench, for the first time, appeared. *See* Dkts. 25–26. The Court then permitted Firequench to move to vacate the default judgment and adjourned the parties' deadline to object to the Report *sine die* pending resolution of the motion to vacate. Dkt. 29.

On September 9, 2022, Firequench moved to vacate. Dkts. 30–33. In an order issued September 29, 2022, the Court stated that it would condition any vacatur of the default judgment on Firequench's payment of the fees and costs Williams had reasonably incurred in connection with pursuing the default judgment and inquest. Dkt. 36. On October 11, 2022, counsel for Williams filed an accounting of those fees and costs, which together exceeded $17,000. Dkt. 37. On October 18, 2022, counsel for Firequench objected that no more than $7,500 of these fees and expenses should be treated as reasonable but, subject to that objection, stated that Firequench would "pay fees and costs plaintiff reasonably incurred in connection with pursuing the default." Dkt. 38 ¶ 4.

On December 5, 2022, the Court denied Firequench's motion to vacate. Dkt. 42. The Court considered the factors relevant to such a motion under Federal Rule of Civil Procedure 55(c): "(1) whether the default was willful; (2) whether the defendant demonstrates the existence of a meritorious defense, and (3) whether, and to what extent, vacating the default will cause the nondefaulting party prejudice." *Robinson v. Sanctuary Music*, 383 F. App'x 54, 58 (2d Cir. 2010) (internal quotation marks omitted).

As to the first factor, the Court found that the record bespoke "egregious" conduct "not satisfactorily explained," *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998), insofar as it

demonstrated that Firequench made a false representation to the Court as to how it had obtained

notice of this action. Firequench claimed to have received notice of the lawsuit via a mailing in

late August 2022 from the Division of Labor Standards that contained Judge Cott's Report as to

damages and nothing further. But direct and circumstantial evidence put the lie to this claim—

including a date stamp on the envelope that *predated* the release of Judge Cott's Report. The

first factor thus disfavored vacatur.

The Court found the other two remaining factors also to disfavor vacatur. In asserting

that it had a meritorious defense, Firequench contended that Williams was not qualified for the

job because she lacked the two years of "alarm technician" experience that Firequench's job

posting had indicated were necessary. But the posting listed such as preferred, not necessary.

And, as to prejudice to the plaintiff, the Court found that Williams's foregone opportunity to

conduct discovery and depose relevant witnesses—due to Firequench's nonappearance—

constituted prejudice. With all three factors disfavoring default, the Court denied Firequench's

motion to vacate. The Court also reopened the period for objections from either party to the

Report for one week from the date of the decision—that is, December 12, 2023.

On December 12, 2022, Firequench filed an interlocutory appeal of the Court's

December 5, 2022 decision to the United States Court of Appeals for the Second Circuit. Dkt.

43. That day, Firequench also filed timely objections to the Report. Dkt. 44. On December 13,

2022, without leave from the Court, Firequench filed "amended" objections to the Report. Dkt.

45 ("Obj."). That day, the Court issued an order stating that "Firequench's appeal appears to be

premature and improper in that a final judgment has not been entered." *Id.* The Court explained

that, before a final judgment could be entered, the Court would need to resolve damages, which

would entail evaluating the Report and the objections thereto. *Id.* Nonetheless, "in the interest

3

of economy," the Court stated it would defer resolving damages while the appeal was pending before the Second Circuit. *Id.*

On March 1, 2023, with the appeal still pending, the Court received a motion from then-counsel for Firequench, seeking to withdraw, Dkts. 47–49, 52, based on "a complete breakdown in [the attorney-client] relationship such that it is not possible for the [f]irm to continue to represent [d]efendant in this [a]ction." Dkt. 48 ¶ 22. Counsel did not identify successor counsel or indicate that a successor counsel was expected to appear. *See* Dkts. 47–49, 52.

On March 2, 2023, the Court denied the motion without prejudice, explaining that no apparent purpose would be served by permitting counsel's withdrawal from representing Firequench before this Court because the case was "stayed in this Court and counsel ha[d] not identified any concrete activity anticipated on the docket of this case." Dkt. 53 at 2. And, the Court stated, "allowing counsel to withdraw without successor counsel appearing [would have] the potential to injure Firequench's interests in the event that, following the Second Circuit's resolution of the appeal, district court proceedings become necessary" because "a corporation can only appear in court with counsel; it cannot be represented pro se by its principal." *Id.*

On June 13, 2023, the Second Circuit granted Firequench's motion to withdraw the appeal. *See* Dkt. 55. Firequench there had stated that "[u]pon careful consideration, it appears that [its] appeal is premature in that a final judgment has not been entered in the underlying matter." *See Williams v. Firequench*, 22-3136-cv, Dkt. 46 at 2. That day, this Court "resume[d] management of the case," giving Williams two weeks to respond to Firequench's objections to the Report. Dkt. 57. On June 27, 2023, Williams filed her response. Dkt. 58 ("Response").

## DISCUSSION

4

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "To accept those portions of the report to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Ruiz v. Citibank, N.A.*, No. 10 Civ. 5950 (KPF), 2014 WL 4635575, at *2 (S.D.N.Y. Aug. 19, 2014) (quoting *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009)); *see also, e.g., Wilds v. United Parcel Serv.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

The Court incorporates by reference the summary of the facts set out in the Report and recites here only those most pertinent to resolving Firequench's objections. Williams, a female, claims to have sought employment with Firequench as a fire alarm technician. Compl. ¶¶ 9, 14. She alleges that, despite her being qualified for the role, *id.* ¶ 12, Firequench "failed to hire, or ceased to consider" her for the fire alarm technician position because of her sex or gender, *id.* ¶ 19. She claims that multiple employees at Firequench told or indicated to her over the phone, when she inquired about the position, that she would not be hired because of her gender. *Id.* ¶¶ 14–18. Williams alleges that as a result, she "continues to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed." *Id.* ¶ 22. She also alleges that she "has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation." *Id.* ¶ 24. After entry of default, Williams sought $939,668.81, including backpay, front pay, emotional distress damages, punitive damages, pre-judgment interest, and attorneys' fees and costs. Report at 4. Williams also sought statutory post-judgment interest. *Id.*

The Report first addresses liability. It examines whether Williams has a viable claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York ("NYCHRL"). Report at 8. It finds that Williams—a member of a protected class who sought employment and who was explicitly told she would not be hired because of her gender—has pleaded allegations of a plausible Title VII claim, and thereby plausible claims under NYSHRL, which applies an identical standard, and NYCHRL, which applies a more lenient standard than Title VII and NYSHRL. *See Mihalik v. Credit Agricole Chevreux N. Am.*, 715 F.3d 102, 109 (2d Cir. 2013); *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020).

The Report next addresses damages. First, as to backpay,[1] it calculates for the period of May 20, 2019 through June 12, 2019, when Williams was unemployed but seeking employment, that Williams is owed $3,461.58. Report at 12. It assumes a $50,000 starting salary (rather than $75,000, as urged by Williams), and treats her first "working day" as if she had been hired five days after her first inquiry. *Id.* at 11. For the period of June 13, 2019 through September 11, 2019, when Williams contends she was working a lower-paid job than what she would have earned at Firequench, Williams is owed an additional $3,140.80. *Id.* at 13. This compensates her for the difference between her pay as a handyman ($18/hour) and the approximately $24.04/hour she would have been paid at Firequench. *Id.* at 12. For the period of September 12,

---

[1] The Report calculates backpay damages through the date of the entry of the default judgment (as opposed to final judgment, which has yet to occur). This approach is consistent with Second Circuit authority. *See, e.g., Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 159 (2d Cir. 1992) ("[B]ack pay runs from the date of termination until the date of judgment.") (citing *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) ("[T]he court should compute the backpay award from the date of the discriminatory act until the date of final judgment.")).

2019 through March 16, 2020, the Report assesses that Williams is not owed backpay. *Id.* at 13.

She received a raise as a handyman to $27/hour, and thus had a higher rate of pay than she would

have had at Firequench. *Id.* On March 16, 2020, Williams resigned from her handyman job,

citing AKAM's—her employer—lack of COVID-19 safety protocols. *Id.* at 13. Because "a

voluntary quit does not toll the back pay period when it is motivated by unreasonable working

conditions or an earnest search for better employment," *Hawkins v. 1115 Legal Serv. Care*, 163

F.3d 684, 696 (2d Cir. 1998), and because Williams demonstrates that she attempted to mitigate

her damages while unemployed by seeking other employment, the Report recommends

$36,538.90 in backpay damages for the period of March 17, 2020 through December 6, 2020.

*Id.* at 15. From December 7, 2020 through September 24, 2021, Williams enrolled in school to

become a barber. Report at 15. She claims she did so because she was unable to find work. The

Report credits that explanation, *id.* at 15, and, based on authority that where a plaintiff decides to

attend school to obtain income after an unsuccessful job search, her duty to mitigate is satisfied,

finds that for this period, Williams is entitled to $40,192.79 in backpay damages, *id.* at 15–16.

From October 1, 2021 through December 14, 2021, Williams worked as a part-time delivery

person for Amazon Flex, earning $2,245. *Id.* at 16. The Report concludes that Williams is

entitled to $7,562.81, the difference between what she earned at Amazon Flex and $9,807.81,

what she would have earned at Firequench, assuming a five-day work week. *Id.* at 16 & n.11.

Finally, for the period of December 15, 2021 through December 16, 2021, Williams is owed

$33.91. *Id.* at 16–17. On December 15, 2021, Williams began working as a warehouse operator

for Target. *Id.* at 16. The next day, default judgment was entered in her favor, bookending the

period for which she is eligible for backpay. *Id.* at 17 (citing *Dunlap-McCuller v. Riese Org.*,

980 F.2d 153, 159 (2d Cir. 1992)). The $33.91 reflects the difference between what Williams

would have made at Firequench ($192.31), and what she made working at Target ($158.40). *Id.* at 17 & n.12.

Second, the Report addresses front pay, emotional distress, and punitive damages. It concludes that Williams is not entitled to front pay because she "has not provided sufficient information such that the Court 'can reasonably predict that [Williams] has no reasonable prospect of obtaining comparable alternative employment.'" *Id.* at 19 (citing *Bergerson v. N.Y. State Off. of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 286 (2d Cir. 2011)). As to emotional damages, the Report reasons that, because Williams lacks "medical evidence or corroboration" of her claims of "depression, anxiousness, and sleeping issues" after Firequench refused to hire her, she is entitled only to "garden variety" emotional damages, and on the lower end of that spectrum, given that the higher end is reserved for discrimination that "was more intentional, physically harmful, and/or lasted for a longer period of time." *Id.* at 20–21 (internal quotation omitted). The Report concludes that $30,000 in emotional distress damages is an appropriate award here. *Id.* at 21. The Report concludes that Williams is not entitled to punitive damages under Title VII or NYCHRL because she has not alleged that Firequench acted with the requisite malice, willfulness, or wanton negligence in its interactions with her. *Id.* at 22–24.

Third, the Report addresses attorneys' fees and costs. As the prevailing party, Williams seeks $21,610 in attorneys' fees and $590.66 in costs. *Id.* at 24. The Report recommends awarding fees and costs, with two modifications. First, it recommends that the hourly billing rate used for a senior associate who worked on the matter be $300, instead of the $350 requested, to better track rates used for fee awards in this District where the "defendant defaulted and thus the issues were not challenged." *Id.* at 25–26 (citing *Siracuse v. Program for the Development of Hum. Potential*, No. 07 Civ. 2205 (CLP), 2012 WL 1624291, at *28 (E.D.N.Y. April 30, 2012)).

8

Second, it recommends treating 1.6 hours of that senior associate's time as billable at a junior associate rate ($200/hour), as that work consisted substantially of administrative tasks. *Id.* at 26. The Report thus concludes that Williams is owed $20,900 in fees and $590.66 in costs.

The Report also finds that Williams is entitled to pre-judgment and post-judgment interest. *Id.* at 17, 27. Under Title VII, it finds, pre-judgment interest is warranted on the backpay damages at the federal interest rate, calculated consistent with the manner described in *Manswell v. Heavenly Miracle Academic Services, Inc.*, No. 14 Civ. 7114 (MKB) (SMG), 2017 WL 9487194, at *16 (E.D.N.Y. Aug. 23, 2017). Post-judgment interest, it finds, is mandatory under 28 U.S.C. § 1961 and must be awarded on all damages here.

In sum, the Report recommends that the Court award Williams damages in the amount of $142,421.45 ($90,930.79 in backpay, $30,000 in emotional distress damages, $20,900 in attorneys' fees, and $590.66 in costs), in addition to pre-judgment interest on the backpay award and post-judgment interest on all sums awarded, commencing when the Clerk of the Court enters judgment until the date of payment. *Id.* at 28.

Firequench objects[2] to two portions of the Report. First, it contends that Williams failed to mitigate her damages between March 17 and December 6, 2020, the period after she resigned from her handyman job. She is therefore, Firequench argues, not entitled to backpay for that timeframe. *Id.* at 4–10. Second, it argues that the Report's recommended fee award of $20,900 is excessive. *Id.* at 10. Firequench does not object to any other portion of the Report, to wit, the conclusions regarding damages awarded for other periods of backpay and for emotional distress,

---

[2] Firequench filed two sets of objections: first, on December 12, 2022, the final day to timely object to the Report; and second, on December 13, 2022, which was outside the 14-day period. *See* Dkts. 44–45. The two sets of objections are substantially similar, with additional factual support in the December 13 filing. The Court exercises its discretion to consider the December 13 objections here.

as well as pre-judgment interest on the backpay and the post-judgment interest on all sums.

Review of these recommendations for clear error is appropriate here, and the Court finds none.

The Court therefore adopts all parts of the Report to which Firequench does not object.

The Court addresses Firequench's objections in turn.

First, as to backpay for the period between March 17 and December 6, 2020, Firequench

contends that Williams did not voluntarily terminate her job on March 16, 2020 due to COVID-

19 health concerns. Firequench carries the burden to demonstrate that Williams failed to attempt

to mitigate. *Hawkins*, 163 F.3d at 695. It is false, it claims, that she terminated the job due to

"unreasonable working conditions"; she did so, it claims, for "personal reasons." Obj. at 5.

In so arguing, Firequench claims that the pandemic did not reach its peak fever until well

after March 16, 2020, as measured by the political response and restrictions on public activity.

*Id.* at 6–7. It notes that Williams "quit the first day of the COVID-19 [p]andemic," *id.* at 8, and

thus did not give her employer sufficient opportunity to provide her with personal protective

equipment ("PPE") or to institute safeguards against the virus. But, elsewhere in its objections,

Firequench contradicts itself. It admits that "the first Executive Order, as it pertains to COVID-

19, was issued on March 7, 2020, which was, thereafter, followed by Executive Order 202.1

signed on March 12, 2020, Executive Order 202.2 signed on March 14, 2022, Executive Order

202.3 signed on March 16, 2020, and Executive Order 202.4 signed on March 16, 2020." *Id.* at

6. By Firequench's own account, the pandemic thus was well under way—and dire enough—to

plausibly prompt an individual to then raise and act upon concerns about workplace safety, even

if later days and weeks brought yet intensified concerns.

Firequench also suggests that Williams has not made specific allegations of

"unreasonable working conditions," in that she has not stated "any specific health concerns or

other issues with her health that would have made it difficult to perform her job," or "included . . . evidence of her attempts to use PPE or other safeguards in her job that were denied." *Id.* at 8. Williams's affidavit makes the sole allegation that, in her handyman role, "even though [she] was interfacing with building tenants, some of whom [she] learned had tested positive for COVID-19, AKAM did not provide us with any PPE or implement a social distancing policy." Dkt. 22-8 ¶ 10. Firequench also argues that even if Williams had been justified in leaving her employment on March 16, 2020, "there is no doubt that [Williams's] employment as a handyman with AKAM would qualify as 'non-essential' pursuant to Executive Order 202.4," which issued that same day, "and, as a result, [Williams] would have been restricted from going into work." Obj, at 6–7. Williams contests this, stating that she "was considered an 'essential worker' by AKAM due to her job responsibilities." Response at 4.

On these points, the Court is left with an insufficient record to determine reliably whether Williams in fact quit her employment with AKAM due to concerns about COVID-19.[3] Although the timing of her resignation makes this claim plausible, the Court does not have sufficient attestations from Williams to show that the reasons for her resignation arose from COVID-19 and her health and safety in the workplace. Further details on her duties would also shed light on her possible status as an essential or non-essential worker. To assure a reliable resolution of this question, the Court reopens the damages inquest, for the limited purpose of ordering discovery limited to (1) Williams's resignation from AKAM on March 16, 2020; (2) her efforts to mitigate between March 16 and December 6, 2020; and (3) her job responsibilities while employed at

---

[3] Firequench relatedly argues that Williams's real reason for quitting on March 16, 2020, was to move to Virginia, a plan she had long before the pandemic started. The limited discovery that the Court orders should shed light on this claim, which Williams disputes.

11

AKAM. Pending such additional information, the Court does not, at this time, adopt the portion of the Report that recommends backpay damages of $36,538.90 for this period.

Firequench's second objection cursorily challenges the recommendation as to attorneys' fees. It states that "a review of the time records shows associates doing paralegal work including calling the court to see how to file and use ECF, ministerial record keeping, and filing of documents." Obj. at 10. As reviewed above, the Report is sensitive to that concern, insofar as it proposes to adjust the hourly rate for 1.6 hours of time that appears administrative in nature. Report at 26. However, as Williams correctly notes, otherwise, Firequench "does not actually identify any specific entries to which they are objecting and simply concludes that briefing the findings of fact and law 'should not have taken over 20 hours of legal research time.'" Response at 6 (quoting Obj. at 12). Given Firequench's cursory and nonspecific argument, the Court did not have any obligation to undertake an independent review of the billing records (Dkt. 22-6) in response to this argument. The Court nonetheless has done so, and has not found time entries supporting Firequench's claim of rampant, unreasonable billing. The Court adopts Judge Cott's recommendations as to attorneys' fees and costs with one adjustment: the 1.6 hours of time spent on administrative tasks will be awarded at the paralegal rate, $100, as opposed to the junior associate rate, $200. Williams will be entitled to make an additional application for attorneys' fees to the extent sought based on work performed in connection with to the limited discovery ordered herein.

## CONCLUSION

For the foregoing reasons, the Court awards Williams damages in the amount of $105,722.55 ($54,391.89 in backpay, $30,000 in emotional distress damages, $20,740 in attorneys' fees, and $590.66 in costs), in addition to pre-judgment interest on the backpay award

12

and post-judgment interest on all sums awarded, commencing when the Clerk of the Court enters judgment until the date of payment.

This case will now proceed to discovery limited to (1) Williams's resignation from AKAM on March 16, 2020; (2) her efforts to mitigate during the period of March 16, 2020 to December 6, 2020; and (3) her job responsibilities while employed at AKAM.  The Court directs the parties promptly to confer, and, within one week of this decision, to submit a case management plan consistent with the Court's Individual Rules that contemplates expedited and limited discovery followed by expedited letter briefing limited to these discrete issues.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 21, 2023
       New York, New York

13